Tamara O'BRADOVICH and Michael McGuire Plaintiffs,

v.

VILLAGE OF TUCKAHOE, Mayor Michael Martino, Village Attroney Leslie Maron, Village Clerk Susan Ciamarra, Village Trustees Sheila Marcotte, Luigi Marcoccia, Phillip Denning and Tony Sayegh, Jr., each in their official and individual capacities, the Law Offices of Irving O. Farber PLLC, and Irving O. Farber, Defendants.

No. 04–CV–0049 CM.

United States District Court, S.D. New York.

July 19, 2004.

414

Debra Palazzo, Law Office of Richard E. Signorelli, New York, NY, for Plaintiffs.

Steven Charles Stern, Miranda & Sokoloff, LLP, Mineola, NY, Cynthia Dolan, Boeggeman, George, Hodges & Corde, P.C., Steven Alan Coploff, Steinberg & Cavaliere, LLP, White Plains, NY, for Defendants.

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

McMAHON, District Judge.

Plaintiffs Tamara O'Bradovich and Michael McGuire commenced this action seeking compensatory and punitive damages against Defendants Village of Tuckahoe (the "Village"), Village Mayor Michael Martino, Village Attorney Leslie Maron, Village Clerk Susan Ciamarra, Irving O. Farber, the law offices of Irving O. Farber PLLC (the "Farber Law Firm"), and the following Village Trustees (collectively, the "Trustees"): Sheila Marcotte, Luigi Marcoccia, Phillip Denning, and Tony Sayegh, Jr. Plaintiffs sue all public employees in their official and individual capacities, and claim civil rights deprivations under 42 U.S.C. §§ 1983, 1985, and 1986, and New York State law.

The Court previously dismissed the claims against Farber and the Farber Law Firm at a conference held on March 5, 2004. The law firm's only role was to represent Defendant Maron in his capacity as a plaintiff in a defamation suit against the Plaintiffs in the present case. No § 1983 action lies against a lawyer or law firm for representing public officials and entities in lawsuits. *Fermin v. Mor-*

*iarty,* 2003 WL 21787351 at *3 (S.D.N.Y. August 4, 2003) (holding that an attorney cannot be sued in federal court for allegedly violating his client's civil rights, since he was not state actor); *Seedman v. Stanley Roy Root & Assocs.,* 2000 WL 290345 at *2 (S.D.N.Y. March 20, 2000) ("Defendants are private attorneys and law firms that do not act under color of state authority."); *see also D'Ottavio v. Depetris,* 1991 WL 206278 at *1 ("Absent special circumstances suggesting concert of action between an attorney and a state representative, an attorney's representation of a defendant in state criminal proceedings does not constitute the degree of state involvement or interference necessary to establish a claim under § 1983 against the attorney even if the attorney was court appointed or employed as a public defender.").

The remaining Defendants now move to dismiss Plaintiffs' claims pursuant to Rules 12(b)(6) and 12(c) of the Federal Rules of Civil Procedure. For the following reasons, Defendants' motion is granted.

## Standard for Motion to Dismiss

Dismissal of a complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) is proper where "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). The test is not whether the plaintiff is ultimately likely to prevail, but whether he is entitled to offer evidence to support his claims. *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998). The court assumes that all factual allegations in the complaint are true, and draws all reasonable inferences in Plaintiffs' favor. *EEOC v. Staten Island Sav. Bank,* 207 F.3d 144 (2d Cir.2000).

## Background

This complaint arises out of the alleged "chilling" of Plaintiffs' First Amendment rights to speak freely on matters of public concern and to petition the government. Plaintiffs allege that as a result of their participation in politically vocal groups and their numerous complaints to, and criticisms of, Village officials, Defendants have (1) tried to silence Plaintiffs' political speech through a law suit, (2) stifled Plaintiffs' attempts to petition the government by creating bureaucratic mazes and obstacles to retrieving public information, and (3) passed laws specifically targeted at Plaintiffs to deny them parking permits.

Since Plaintiffs moved to Tuckahoe in 1987, they have been active in community affairs and have volunteered for, and participated in, numerous Village activities. They helped found the Active Citizens of Tuckahoe (ACT), an outreach program that promotes government accountability, encourages citizen involvement in government affairs, and offers an open forum for concerned and disenfranchised citizens to meet publicly and discuss issues concerning the Village. (Compl.¶ 17.) Plaintiffs have also been vocal in Village affairs, speaking out at public meetings, writing letters to the Village government, reviewing and requesting copies of public documents, commenting on the Village budget, questioning the Village's fiscal policy, and sometimes criticizing the actions and decisions of Village officials. (Compl.¶ 33.) Finally, Plaintiffs have made liberal use of a document-request procedure under New York State's Freedom of Information Law (hereinafter "FOIL"), which requires government agencies to make their records available to the public upon request. N.Y. PUB. OFFICERS LAW § 87 (McKinney 2003). Plaintiff O'Bradovich has filed numerous FOIL requests: she has a reputation in the Village for having filed over 150 requests, including at least 24 requests regarding a single construction project. (Compl.¶¶ 57, 73).

Plaintiffs claim that Defendants took several steps to retaliate against them for their public affairs activity.

First and foremost, Plaintiffs found themselves as defendants in a defamation action commenced by Defendant Maron. From about January 2002 through June 2003, Plaintiff O'Bradovich wrote six letters to Village officials, criticizing the performance of Defendant Maron in his official capacity as Village Attorney. In one of those letters, written to Defendant Mayor Martino, Plaintiff complained about Maron's unprofessional conduct and the quality of services he was providing the Village and suggested he be replaced by someone more fit to serve the Village's interests. (Compl.¶¶ 66–67.) All six of Plaintiff O'Bradovich's letters were forwarded to Maron, who subsequently filed an eleven-million-dollar civil lawsuit against Plaintiffs for defamation. *See Maron v. O'Bradovich and McGuire,* Supreme Court of New York, Index # 03/11495. Maron retained Defendants Farber and the Farber Law Firm to represent him in the lawsuit.

Starting on or about August 8, 2003, Plaintiffs wrote several letters to Martino and other Village officials, asking them to intervene and stop Maron's lawsuit. (Compl, Ex. A, p. 25.) They got no response, and the lawsuit went forward. Defendant Ciamarra submitted a signed affidavit in support of Maron's complaint. (Compl.¶ 83.)

The complaint against Plaintiffs was eventually dismissed. The presiding judge concluded that O'Bradovich's statements were not defamatory because Maron was a public official, which made criticisms of his official performance matters of public concern. (Compl., Ex. C, p. 22.)

The second source of conflict is a Village parking ordinance that denied any person with outstanding parking tickets (sometimes referred to as a "scofflaw") a resident parking permit. Prior to January 14, 2002, Plaintiffs allege, the ordinance prohibited the issuance of parking permits to residents with three or more unpaid parking tickets. On November 9, 2001, Plaintiff O'Bradovich sought a renewal for her parking permit, but was denied because she had *two* unpaid tickets. O'Bradovich allegedly was forced to "stand at Village Hall and argue with the Village Clerk [Defendant Ciamarra] about the law until the Village Clerk agreed to give her the parking permit." She also sent two letters of complaint to Martino and the Village Trustees.

Approximately thirty days after the receipt of Plaintiff O'Bradovich's second letter, on January 14, 2002, the Village amended the parking ordinance to prohibit the issuance of parking permits to individuals with *any* outstanding parking tickets. Plaintiffs contend that this amendment operates as a bill of attainder and also allege that the law was specifically passed in retaliation for the hostility O'Bradovich displayed to the Village Clerk when she was initially denied a permit.

Third, the Village allegedly set up "bureaucratic loopholes, obstacles and roadblocks" *only* against Plaintiffs in order to inhibit their ability to petition the government. (Compl. ¶ 217.) Plaintiffs claim they were subjected to unequal treatment in the following ways:

(1) Plaintiffs were "slapped with an eleven million dollar ($11,000,000) defamation lawsuit" for speaking out against Village officials, while other vocal citizens were not;

(2) Defendant Trustee Marcotte kept a litigation file on O'Bradovich, but on no one else in the community;

(3) The day after a Village meeting in which citizens were handed out certain public documents for free, Plaintiffs were forced to pay for and go through extra red tape to retrieve those documents themselves;

(4) When Plaintiff O'Bradovich requested to see the litigation file that the Village kept on her, she was told it would take twenty-five days to search and gather the information, though a reporter received the information immediately upon demand six months earlier;

(5) When Plaintiffs contacted a certain non-defendant Village official, they were told their communications must go through Defendant Maron first, though other citizens' calls were not rerouted or screened;

(6) Defendant Martino did not respond to Plaintiff O'Bradovich's numerous calls, emails, and letters to schedule an appointment, though he met with other citizens timely;

(7) Defendant Trustee Marcotte did not respond to O'Bradovich's emails, except to put O'Bradovich "on notice" that she was not to use Marcotte's email address again;

(8) Plaintiff O'Bradovich was forced to argue with Defendant Ciamarra to get a parking permit, while other citizens who also had only two outstanding parking tickets were given permits without confrontation. (Compl. ¶¶ 193–217.)

Finally Plaintiffs allege that Village officials limited their ability to access public files under FOIL. After Plaintiff O'Bradovich made twenty-four separate FOIL requests regarding a construction project, the Village enacted a policy that forbade residents to view public property and assessment records without first obtaining permission from the owner or having a

Village official screen the record. The Village repealed this policy, since it obviously violated FOIL, but then replaced it with a resolution requiring that: "all FOIL requests to the Village of Tuckahoe ... be made in writing by hand delivery, U.S. mail or overnight delivery service..." Village staff were instructed to ignore FOIL requests received via e-mail and fax. (Compl. ¶ 242, Defendants' Notice of Motion Ex. B.) Plaintiffs claim that, as a result of this policy, they have "been singled out by Defendants to undergo whatever bureaucratic maze they can create to obstruct and hinder Plaintiffs' access to these public records." (Compl. ¶ 246.) They further allege that many of Plaintiff O'Bradovich's FOIL requests have not been answered, and that "despite filing numerous FOILS, O'Bradovich has not been able to obtain *specific* information she has sought" on various Village activities. (Compl. ¶ 47.)

### The Instant Complaint

Plaintiffs filed suit in this court, seeking to hold Defendants liable for filing the Maron lawsuit. They argue that the lawsuit "chilled" their First Amendment rights to petition the government and speak out on matters of public concern (Counts One and Two), amounted to unconstitutional retaliation for their lawful exercise of First Amendment rights (Count Six), and denied Plaintiffs their Fourteenth Amendment right to be free from unjustified litigation (Count Three), all in violation of 42 U.S.C. § 1983. They also assert that Maron's lawsuit amounted to malicious prosecution, abuse of process, abuse of power, and intentional infliction of emotional distress (Counts Four, Five, and Ten).

Derived from these allegations regarding the Maron lawsuit are Plaintiff's claims that the Village and the Trustees are liable for failing to train the Village employees and prevent them from acting unlawfully,

in violation of §§ 1983 and 1986 (Counts Seven, Nine, and Fourteen), and that Defendants Maron and Ciamarra (together with the Farber Law Firm Defendants) are liable for conspiring to violate Plaintiffs' rights, in violation of § 1985 (Count Thirteen).

Plaintiffs further claim that Defendants denied them their Fourteenth Amendment rights to due process and equal protection by making Plaintiffs alone face bureaucratic obstacles to request documents and speak with Village officials, in violation of § 1983 (Count Twelve), and for passing the new parking ordinance, which qualified as a bill of attainder directed solely at Plaintiffs (Count Eleven).

Finally, Plaintiffs claim that the Village's failure to fulfill all of Plaintiff O'Bradovich's FOIL requests, and its new policy limiting citizens' ability to request public documents, inhibited Plaintiffs' ability to petition the government in violation of the First Amendment and § 1983 (Counts Eight and Fifteen).

### Discussion

#### A. Claims Relating to the Maron Lawsuit

Plaintiffs claim that by filing, participating in, and failing to prevent the Maron lawsuit, Defendants "chilled" their First Amendment rights (Counts One and Two), retaliated against them for exercising their constitutional rights (Count Six), abused process (Count Four), and denied Plaintiffs equal protection and due process (Counts Eight and Twelve), in violation of §§ 1983 and 1986. All of the claims stemming solely from the Maron lawsuit must be dismissed.

*(1) Defendant Maron's Filing of a Civil Lawsuit in State Court Did Not Constitute State Action.*

Section 1983 allows individuals to sue government officials who violate their civil

rights while acting "under color of any statute, ordinance, regulation, custom, or usage, of any State." 42 U.S.C. § 1983. A threshold issue in § 1983 actions, therefore, is determining whether or not the charged defendants acted under the color of state law when they allegedly violated the plaintiff's civil rights.

■ "To qualify as state action" the Second Circuit has held, "the conduct in question must be caused by the exercise of some right or privilege created by the State." *United States v. Int'l Bhd. Of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 941 F.2d 1292, 1295–96 (2d Cir.1991) (internal citations and quotations omitted). A plaintiff fails to state a claim under § 1983, and his complaint must be dismissed pursuant to Rule 12(b)(6), when he does not sufficiently allege that the defendant's wrongful action was an exercise of "power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Monsky v. Moraghan*, 127 F.3d 243, 245 (2d Cir.1997) (quoting *West v. Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)).

Thus, for Defendant Maron to have violated Plaintiffs' civil rights, his filing of the defamation lawsuit in state court must have been an exercise of his state-granted power as the Village Attorney. It was not.

■ In suing Plaintiffs, Maron is not alleged to have been performing his official duties as Village Attorney, nor to have invoked any special power granted to him by virtue of holding that office. Indeed, the Second Circuit explicitly held in *Colombo v. O'Connell*, 310 F.3d 115 (2d Cir. 2002) that public officials are not liable under § 1983 when they sue citizens for defamation. In that case Colombo, a politically vocal citizen, complained of the alleged illegal activities of O'Connell, a school superintendent. Colombo called for O'Connell's removal from office, and the superintendent threatened to sue for defamation. Colombo filed suit under § 1983 claiming that her First Amendment rights had been violated by this threat of litigation. *Id.* at 118. The Second Circuit held that the superintendent's actions were not the result of his having exercised any "special powers possessed by virtue of state law, nor were his actions made possible only because he was clothed with authority of state law." *Id.* (citations and quotations omitted). The court went on to affirm public officials' rights to access the courts by filing private lawsuits:

> [F]ar from O'Connell being foreclosed from bringing suit against Colombo in his private capacity, the right of a private individual to sue and defend in the courts is itself protected by the First Amendment because it is the right conservative of all other rights which lies at the foundation of orderly government. It is well-established that public employees do not check all of their First Amendment rights at the door upon accepting public employment. O'Connell, therefore, had no obligation to refrain from suing Colombo privately merely because he currently serves as the Superintendent of Schools of the Town of Stratford, nor did he violate her First Amendment rights by doing so.

*Id.* (internal citations and quotations omitted).

The case at bar is indistinguishable from *Colombo*. Contrary to Plaintiffs' argument, it makes no difference that Maron held a position of more status and power than O'Connell, or that Maron was not accused of illegal activity. (*See* Opposing Br. at 16–17.) Nor is it relevant that the state court classified Maron as a public official for the purposes of deciding his defamation lawsuit.

Regardless of how much power Maron had, how he was criticized, or how his job

was classified, his right to access the courts to settle a civil claim is not a power that stemmed solely from his position as Village Attorney. As the *Colombo* court held, it is a right that stemmed from his status as a citizen of this country. *See Id.* Defendant Maron did not abandon his First Amendment right to access the courts for civil lawsuits when he became a public official. He therefore, had no obligation to refrain from suing Plaintiffs privately, merely because he served at the time as the Village Attorney.

Plaintiffs' claim is not strengthened by the allegation that Defendant Maron's defamation suit was frivolous (which, by the way, it was). "Both logic and precedent suggest that merely by holding its courts open to litigation of complaints, regardless of how baseless they eventually prove to be, [a state] does not clothe persons who use its judicial processes with the authority of the state." *Stevens v. Frick* 372 F.2d 378 (2d Cir.1967); *see also Henry v. First Nat. Bank of Clarksdale,* 444 F.2d 1300 (5th Cir.1971).

Plaintiffs note in their brief that the Supreme Court has identified certain situations in which civil lawsuits can give rise to state action. (Opposing Br. at 20–21). They cite *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), in which the Court held that even when a civil lawsuit is between private parties, if the state court applies a state law or rule that imposes invalid restrictions on an individual's First Amendment rights, then state action is present: "It matters not that the law has been applied in a civil action .... The test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised." *New York Times,* 376 U.S. 254, at 265, 84 S.Ct. 710.

However, *New York Times* is clearly inapposite. That case held that state ac-

tion is present when a state court renders of a final or dispositive judgment enforcing a law that deprives a party of constitutional rights. Here the offensive "state action" is not that of the Court (which, after all, dismissed Maron's lawsuit), but of Maron—who happened to be acting in his private capacity. It is plainly outside the scope of *New York Times.*

Because Maron's filing of the defamation lawsuit did not constitute state action, it is not actionable under § 1983. Counts One, Two, Six, Eight, and Twelve, insofar as they allege Maron's liability under § 1983, are dismissed.

> *(2) Defendant Ciamarra's Participation in the Maron Lawsuit Did Not Constitute State Action.*

Plaintiffs also fail to state valid claims against Defendant Ciamarra for violating Plaintiffs' civil rights by testifying in Maron's lawsuit.

■■ Even though Defendant Ciamarra was the Village Clerk, and so a potential state actor, Plaintiffs fail to allege that Ciamarra was acting under the color of state law when she "voluntarily submitt[ed] a sworn affidavit, in support of Maron's complaint" in the Maron lawsuit. (Compl.¶ 83.) And in fact she was not. No action lies under § 1983 for damages against a private party for testimony in a judicial proceeding: "when a private party gives testimony in open court ... that act is not performed 'under color of law.'" *Briscoe v. LaHue,* 460 U.S. 325, 329–30, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983); *see also Storck v. Suffolk County Dep't of Soc. Servs.,* 62 F.Supp.2d 927, 941 (E.D.N.Y. 1999) (holding that "the mere fact that an individual testifies at a court proceeding does not render that person a state actor" for § 1983 purposes).

Ciamarra's signing of an affidavit for the Maron lawsuit falls squarely under *Bris-*

*coe*'s rubric,[1] and as a matter of a law cannot be considered state action, regardless of the fact that Ciamarra held the position of Village Clerk. Ciamarra thus is not liable under § 1983 for violating Plaintiffs' civil rights.

Counts One, Two, and Three, insofar as they assert § 1983 claims against Ciamarra, are dismissed.

> *(3) The Village, Mayor Martino, and the Trustees Are Not Liable For Failing to Prevent Maron and Ciamarra from Initiating or Participating in the Maron Suit.*

Plaintiffs also allege claims arising out of the Maron lawsuit against the Village, Mayor Martino, and the Trustees. Counts Seven and Fourteen assert that Defendants are liable under 42 U.S.C. § 1986 for their failure to prevent the civil rights infractions the Maron lawsuit allegedly caused. Count Nine alleges they are liable under § 1983 for their failure to train Village employees not to deprive Plaintiffs of their civil rights.

These claims, too, must be dismissed. They are derivative of the non-actionable claim against Maron, which involved no state action.

■ It is well settled that state officials and municipalities cannot be held liable for failing to prevent private actors from violating an individual's civil rights. *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). The Supreme Court has held that, while the Constitution forbids the State from impinging on an individual's civil rights, "its language cannot fairly be extended to impose an affirmative

obligation on the State to ensure that those interests do not come to harm through other means." *Id.* at 195, 109 S.Ct. 998.

Counts Seven, Nine, and Fourteen are therefore dismissed.

> *(4) Defendants Maron, Farber, and the Farber Law Firm's Initiation of a Civil Lawsuit Cannot Constitute Malicious Prosecution.*

In Count Three, Plaintiffs' claim that Defendants Maron, Farber, and the Farber Law Firm are liable for malicious prosecution for the commencement of the defamation suit. This claim is dismissed.

■ Section 1983 liability for malicious prosecution attaches only to *criminal* prosecutions; it does not extend to civil cases or abuse of process cases. The Second Circuit held in *Spear v. Town of West Hartford*, 954 F.2d 63 (2d Cir.1992), that a malicious prosecution claim is properly dismissed when it is asserted by an individual who was "subject only to civil, and not criminal liability" in the underlying suit. *Id.* at 68; *see also, White v. Frank*, 855 F.2d 956, 961 n. 5 (2d Cir.1988); *Havas v. Thornton*, 609 F.2d 372, 376 (9th Cir.1979).

> *(5) Plaintiffs' Claims that the Maron Lawsuit Violated the Fourteenth Amendment and Amounted to an Abuse of Power are Not Actionable.*

Plaintiffs state two additional § 1983 claims stemming from the Maron lawsuit. In Count Three, they allege violation of their Fourteenth Amendment right to be free from "false, baseless and unjustified litigation" (Compl.¶¶ 114–41); in Count

---

1. *Briscoe* and *Storck* speak of "testimony" in a general sense, and do not explicitly address whether the signing of an affidavit can be considered state action. However, I conclude that the signing of an affidavit is exactly analogous to giving testimony in open court for

the purposes of this case. According to Black's, "testimony" is defined as "[e]vidence that a competent witness under oath or affirmation gives at trial *or in an affidavit* or deposition." BLACK'S LAW DICTIONARY 58 (7th ed.1999) (emphasis added).

Five they state a claim for "abuse of power" under § 1983 (Compl. ¶¶ 146–49). Neither of these claims is actionable.

■ First, no case of which I am aware has ever held that the Fourteenth Amendment guarantees the right to be free from baseless civil litigation. Plaintiffs are therefore mistaken when they claim that Maron violated their Fourteenth Amendment rights by suing them.

■ Second, "abuse of power" is not an independently cognizable claim for § 1983 purposes. That Defendants allegedly abused their power when they took the actions complained of adds nothing of legal significance to Plaintiffs' complaint. Section 1983 draws no distinction between abusive and nonabusive federal violations and does not require proof of abuse of governmental power separate and apart from proof of constitutional violations. Although the statute provides citizens with a remedy for abuses of state power that do violate federal law, it does not provide a remedy for abuses that do not. *Collins v. City of Harker Heights*, 503 U.S. 115, 120, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992).

Counts Three and Five are, therefore, dismissed.

### (6) Plaintiffs' Claims That the Maron Lawsuit Violated Due Process and Equal Protection Are Dismissed.

Plaintiffs allege, in Counts Eight and Twelve, that Defendants' filing of the Maron lawsuit violated the Fourteenth Amendment because it singled Plaintiffs out and punished them for petitioning the Village government.

■ Fourteenth Amendment claims of equal protection are bound by the same "state action" requirement as other civil rights claims brought under § 1983. *E.g. Shelley v. Kramer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). Because Maron, in filing his lawsuit, acted as a private

actor, he did not violate the Fourteenth Amendment. Counts Eight and Twelve are dismissed to the extent that they rely on the filing of the Maron lawsuit.

### (7) Plaintiffs' Civil Rights Conspiracy Claims Are Dismissed.

In addition to their numerous § 1983 claims, Plaintiffs allege in Count Thirteen that Defendants Maron, Ciamarra, Farber, and the Farber Law Firm are liable under 42 U.S.C. § 1985 for conspiring to deprive Plaintiffs of their civil rights by filing the Maron lawsuit. Plaintiffs further claim that Defendants Martino, the Village, and the Trustees are liable under 42 U.S.C. § 1986 for failing to prevent this conspiracy. Both of these claims are dismissed.

■ I have already concluded that Plaintiffs have failed to state a claim asserting that Defendants unlawfully deprived them of their federal or constitutional rights in connection with the Maron lawsuit. In the absence of any claim establishing a violation of civil rights, the court must also dismiss claims of conspiracy brought under § 1985. *See Indianapolis Minority Contractors Ass'n., Inc. v. Wiley*, 187 F.3d 743, 754 (7th Cir.1999) (holding that the absence of any underlying violation of plaintiffs' rights precludes the possibility of success on a claim for conspiracy to violate civil rights under § 1985); *Jones v. Clinton*, 990 F.Supp. 657, 676 (E.D.Ark.1998) ("absent an underlying violation of federal law, there can be no actionable claim alleging a conspiracy to achieve that end"); *Wiggins v. Hitchens*, 853 F.Supp. 505, 511 (D.D.C.1994) ("There can be no recovery under section 1985(3) absent a violation of a substantive federal right").

■ Plaintiffs' inability to state a claim for conspiracy under § 1985 is, in turn, fatal to their § 1986 claim against Defendants Martino, the Village, and the Trus-

tees for failure to prevent the alleged § 1985 infractions. Section 1985 liability is a predicate to § 1986 liability, 42 U.S.C. § 1986, and so a § 1986 claim must be dismissed when no § 1985 liability is successfully alleged, *Brown v. City of Oneonta,* 221 F.3d 329, 341 (2d Cir.2000).

The complaint fails to state an actionable claim under both § 1985 and § 1986. Count Thirteen is therefore dismissed.

### B. Claims Relating to the Village Parking Ordinance

*(1) The Ordinance Was Not a Bill of Attainder.*

■ Count Eleven of the complaint alleges that the Village's ordinance denying a parking permit to any individual with unpaid parking tickets amounted to a bill of attainder. Plaintiffs claim that the Village, motivated by animosity towards Plaintiff O'Bradovich for her "expressions of hostility towards the Village Clerk" for denying her a parking permit, targeted and punished Plaintiffs by refusing to issue them parking permits, and so denied them their constitutional rights in violation of § 1983. This claim is dismissed.

■ The Constitution forbids both Congress and States from passing bills of attainder. U.S. Const. art 1, §§ 9, 10. A bill of attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Consol. Edison Co. of New York v. Pataki,* 292 F.3d 338, 346 (2d Cir.2002). That is, the Bill of Attainder Clause (along with its constitutional neighbor, the Ex Post Facto Clause) was intended to limit a legislature's ability to penalize conduct that took place before the passage of the challenged law by singling out disfavored individuals for summary punishment. 16B Am. Jur. 2D *Constitutional Law* § 676 (2003).

■ In order for a statute to constitute a bill of attainder, three elements must be established: nonjudicial punishment, lack of a judicial trial, and specificity in identification of the individuals affected. *Selective Serv. Sys. v. Minn. Pub. Int. Research Group,* 468 U.S. 841, 847, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984).

Plaintiffs have alleged the first two elements. They claim that, without trial or hearing, they were denied parking permits, and thus have been legislatively punished for Plaintiff O'Bradovich's quarrel with Defendant Ciamarra. However, their bill of attainder claim is dismissed because it fails to allege the third element: that the challenged ordinance specifically targets *identifiable individuals.*

■ The Supreme Court has held that such singling out for legislative punishment occurs when "the individual is called by name or described in terms of conduct which, because it is past conduct, operates only as a designation of particular persons." *Communist Party of the United States v. Subversive Activities Control Bd.,* 367 U.S. 1, 86, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961). When a law neither specifies a group by name, nor targets a group by defining it in terms of irreversible past conduct, it lacks the requisite "specificity" to be deemed a bill of attainder. Therefore, the Court has concluded, there are two situations in which the "specificity" element will be absent: when the challenged law is a law of general applicability, and when the law punishes a *reversible* condition.

■ Laws of general applicability that "set forth general qualifications applicable to all persons who" want to receive a certain government-conferred benefit (such as a medical license or, more on point, a parking permit) and do not "single out a specific person or group for deprivation" cannot be bills of attainder. *United States*

*v. Brown,* 381 U.S. 437, n. 21, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965). Indeed, as the *Brown* court noted, passing laws of general applicability is the paradigm of what legislatures are allowed to do; such laws are the logical opposites of attainders. *Id.* at 461 (holding that laws of general applicability are the proper alternatives to attainders, and that a legislature can deny classes of people certain government benefits, but "must accomplish such results by rules of general applicability[, not by specifying] the people upon whom the sanction it prescribes is to be levied").

 Furthermore, laws that make the issuance of government-conferred benefits contingent on an individual's satisfying a feasible requirement or overcoming a reversible condition in the future are not bills of attainder, either. In *Selective Service System v. Minnesota Public Interest Research Group,* 468 U.S. 841, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984), the Court recognized a difference between laws punishing permanent, unchangeable conditions, and those merely punishing conditions that can be eradicated timely at the complainant's discretion. A law is unconstitutional when it penalizes past actions that occurred before its passage and that cannot be undone, such that affected individuals are *forever* precluded from receiving a certain benefit. Immediately following the Civil War, for example, the Court struck down statutes that denied individuals entrance into the medical and legal professions if they had ever been associated with the Confederacy. *Id.* at 848, 104 S.Ct. 3348 (citing *Cummings v. Missouri,* 4 Wall. 277, 71 U.S. 277, 18 L.Ed. 356 (1866), and *Ex parte Garland,* 4 Wall. 333, 71 U.S. 333, 18 L.Ed. 366 (1866)). "[T]he persons in the group[s] disqualified were defined entirely by irreversible acts committed by them." *Id.*

However, the Court held that a law cannot be an attainder if it imposes requirements that are "far from irreversible, [but rather] can be met readily" at the discretion of the complainant. *Id.* at 851, 104 S.Ct. 3348. It therefore upheld a law that denied financial aid to students who had not yet registered for the draft: "Far from attaching to ... past and ineradicable actions, ineligibility for Title IV benefits is made to turn upon [a] continuingly contemporaneous fact which a student who wants public assistance can correct." *Id.* (internal quotations and citations omitted). In other words, since the complainant students could register for the draft at any time and thus avoid the contested law's denial of financial aid, the law could not be deemed a bill of attainder. The law did not specify a fixed group of individuals who were defined solely by past, irreversible acts.

The Village's parking ordinance lacks "specificity" under both the above analyses. First, it does not specify Plaintiffs by name, but rather is a law of general applicability: it sets forth a general qualification (having no unpaid parking tickets) that is applicable to all Village citizens who want to receive parking permits. Second, it does not punish irreversible past behavior, but rather makes the receipt of parking permits turn upon the continuingly contemporaneous fact of having at least one unpaid parking ticket. This is a condition that Plaintiffs can correct at any time simply by paying their outstanding parking fines.

Count Eleven is dismissed.

*(2) The Ordinance Does Not Violate the Fourteenth Amendment.*

 Plaintiffs alternatively assert, in Count Twelve, that the parking ordinance violated their Fourteenth Amendment rights to equal protection and due process. This claim must be dismissed as well.

■ When reviewing legislation that is challenged as unconstitutional under the Fourteenth Amendment's Equal Protection Clause, the court presumes the challenged law to be valid as long as (1) it does not restrict a fundamental right, (2) it does not employ a suspect classification, and (3) it is rationally related to a legitimate government interest. *E.g., City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

Plaintiffs allege no fact that would overcome this presumption of validity.

First, there is nothing "fundamental" about having the right to park in permitted spaces.

Second, the only distinction the ordinance draws on its face is that between those who have outstanding parking tickets and those who do not. Scofflaws are not a "suspect" classification for equal protection purposes where rights to park are concerned.

Third, the law can easily pass the rational relationship test. The Village has a legitimate interest in encouraging citizens to pay their outstanding parking fines and in discouraging future "deadbeat-ism" by denying parking permits to known and continuing offenders of the parking laws. What is more, the Village's decision to deny parking permits to anyone with an outstanding parking ticket is rationally related to these permissible goals. The Village parking ordinance thus does not violate the Equal Protection Clause.

■ Nor does the ordinance violate Plaintiff's Fourteenth Amendment right to due process, substantive or procedural.

■ First, under a substantive due process analysis, a law is subject to different levels of scrutiny depending on the importance of the right or interest it allegedly denies the complainant. *E.g., Immediato v. Rye Neck Sch. Dist.,* 73 F.3d 454 (2d Cir.1996). "Where the claimed right is not fundamental, the governmental regulation need only be reasonably related to a legitimate state objective." *Id.* at 460–61. As noted above, the ordinance does not deny any fundamental right, and it is clearly related to legitimate government objectives. Therefore, it does not violate substantive due process.

■ Second, as a matter of a law, Plaintiffs have no right to challenge the ordinance as a violation of procedural due process. Procedural due process restricts the government's ability to deprive individuals of their property and liberty interests without affording them notice or giving them the opportunity to be heard prior to the deprivation. *RR Vill. Ass'n, Inc. v. Denver Sewer Corp.,* 826 F.2d 1197, 1203–04 (2d Cir.1987) ("First, affording notice before the deprivation of property is itself a fundamental requirement of procedural due process .... Second, due process ordinarily requires some opportunity to be heard prior to the deprivation of property.") (citations omitted). However, procedural due process restrictions apply only to adjudicative official action; procedural due process claims must be dismissed when they challenge purely legislative action. *Id.; Interport Pilots Agency, Inc. v. Sammis,* 14 F.3d 133, 142 (2d Cir.1994) ("Plaintiffs' procedural due process claim should have been dismissed because the challenged official action ... was essentially legislative rather than adjudicative. Official action that is legislative in nature is not subject to the notice and hearing requirements of the due process clause.").

■ Official action is adjudicative when it is "designed to adjudicate disputed facts in particular cases." *United States v. Florida East Coast Ry. Co.,* 410 U.S. 224, 245, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973). It is legislative when it has "general application and look[s] to the future." *Interport,* 14 F.3d at 142. (citing *Air Line Pilots*

*Ass'n v. Quesada,* 276 F.2d 892 (2d Cir. 1960) (holding that Federal Aviation Agency's regulation adding new qualifications for being able to pilot a commercial airplane was legislative and not bound by procedural due process, even though some individuals would be denied the right to fly because of the new qualifications)).

The Village parking ordinance was not designed to adjudicate disputed facts in particular cases, but was instead a prospective rule announcing a new qualification for parking permits that would bind all citizens in the future. Therefore, the Village's passage of the parking ordinance must be considered legislative official action. Since legislative action cannot be challenged under the procedural facet of the Due Process Clause, Plaintiffs' due process claim regarding the parking ordinance (Count Eight) must be dismissed.

### C. Claims Relating to "Bureaucratic Loopholes, Obstacles, and Roadblocks"

Plaintiffs next allege that the Village singled them out for unique treatment and violated their Fourteenth Amendment right to equal protection by forcing them, and no one else, to face certain bureaucratic obstacles when dealing with the Village government (Count Twelve). They were treated unequally, they assert, because (1) they were the only citizens on whom the Village kept a litigation file, (2) they alone were made to face bureaucratic obstacles when they attempted to receive copies of certain public documents, (3) their phone calls and letters to public officials were ignored, responded to rudely, or screened and rerouted, and (4) they were forced to argue with the Village clerk in order to receive a parking permit. Plaintiffs contend that no other similarly situated citizen received such treatment, and that these actions were intended to punish them for their exercise of their constitu-

tional right to petition the government. These claims are dismissed.

*(1) Plaintiffs Have Not Alleged That They Were "Similarly Situated" Compared to Other Citizens Who Did Not Face Bureaucratic Obstacles When Retrieving Public Documents.*

■ To state a claim under the Equal Protection Clause, Plaintiffs must allege (1) that they were selectively treated compared to other similarly situated citizens, and (2) that such selective treatment was based on impermissible considerations such as race, religion, the intent to inhibit or punish the lawful exercise of constitutional rights, or malicious intent to injure a person. *E.g. Crowley v. Courville,* 76 F.3d 47, 52–53 (2nd Cir.1996) (citations and quotations omitted).

■ While the Fourteenth Amendment is usually invoked by people who have been discriminated against based on their membership in a protected class, it may nevertheless be invoked equally by a "class of one" who "has been intentionally treated differently from others similarly situated [with] no rational basis for the difference in treatment." *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (per curiam). Accordingly, as "a class of one," a plaintiff must show either that "there was no rational basis for the unequal treatment received ... or that the [unequal treatment] was motivated by animus." *Harlen Assocs. v. Incorporated Village of Mineola,* 273 F.3d 494, 499 (2d Cir.2001).

■ The complaint alleges in essence that Plaintiff O'Bradovich was forced to pay for, and to face bureaucratic obstacles to retrieve, certain public documents that other citizens could retrieve more readily.

There is no doubt under *Olech* and *Harlen* that if the Village had a policy of granting free and easy access to public documents, but then forced a lone individual to pay and wait weeks for those documents without any rational justification, or with an intent to punish that person for petitioning the government, its actions would violate the Fourteenth Amendment.

However, Plaintiffs' complaint does not allege that Plaintiffs were similarly situated compared to the other citizens who were able to retrieve the documents in question without facing the bureaucratic obstacles to which Plaintiff O'Bradovich was subjected.

Plaintiffs do not allege they tried to obtain the October 8 Village meeting documents at the meeting where they were handed out for free. Rather, they allege that they sought copies of the documents the day after the meeting. (Compl.¶¶ 202–03.) This belies the allegation that Plaintiffs were similarly situated compared to the citizens who attended the town meeting and received free copies of the documents. Plaintiffs do not assert that other persons who were not at Village meetings and who thereafter attempted to obtain documents were given those documents without having to jump through hoops.

Likewise, Plaintiffs do not allege that O'Bradovich was treated differently from similarly situated citizens when she was told that her request to see the litigation file the Village kept on her would be delayed. Since O'Bradovich asked for the file *six months* after the reporter did, she cannot reasonably be said to be similarly situated with respect to that reporter. Moreover, she was a party to the litigation, and different considerations attended her request for the documents. Indeed, as parties to the lawsuit, Plaintiffs were *uniquely* situated, making equal protection analysis inapplicable.

*(2) Plaintiffs Have Not Alleged That Being Ignored by, and Forced to Argue with, Government Officials Amounts to Unequal Protection of the Laws.*

The Fourteenth Amendment of the Constitution forbids states from denying "to any person within its jurisdiction the equal protection *of the laws.*" U.S. CONST. amend. XXIV, § 1. The crux of an equal protection claim is that "all persons similarly situated shall be treated alike." *E.g. F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 420, 40 S.Ct. 560, 64 L.Ed. 989 (1920). However, the Amendment does not protect citizens from the harms or inconveniences that result from *any* unequal treatment by government officials; it only protects them from receiving unequal *protection of the laws.*

"[T]he purpose of the equal protection clause of the fourteenth amendment was to forbid [two] kinds of unequal state action: the enactment of discriminatory laws and the discriminatory administration or enforcement of laws that were not themselves discriminatory." *Stern v. Tarrant County Hosp. Dist.*, 778 F.2d 1052, 1063 (5th Cir.1985); *see also Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (declaring unconstitutional the unequal enforcement of a facially non-discriminatory law). A plaintiff may claim an equal protection violation, therefore, when *a law or policy* (either on its face, or because of the way it is applied) confers certain rights, privileges, or benefits on one group of citizens, and denies them to others without rational justification.

However, neither the Supreme Court nor the Second Circuit has held that the Equal Protection Clause applies when a plaintiff alleges unequal treatment that does not stem either from the existence of a discriminatory law or policy, or the dis-

criminatory enforcement of an otherwise non-discriminatory law or policy. Plaintiffs could only state a claim if they were to allege that they were denied a right, privilege, or benefit granted by a statute or some official policy. Here, they claim nothing more than that they were treated rudely by government officials.

No law compelled Defendants to answer their emails, take particular telephone calls, or respond to letters promptly. Nor did any law give Plaintiffs the right not to have to argue with a Village clerk over the issuance of a parking permit. The Fourteenth Amendment simply does not require public officials to be equally accessible or polite to all citizens who seek them out.

The complaint does allege the existence of a parking ordinance, which, in November 2001, conferred upon citizens the right to receive parking permits as long as they did not have three or more outstanding parking tickets. But it does not allege that Plaintiffs were denied this right: the complaint concedes that, after arguing with the Village Clerk, Plaintiff O'Bradovich was given the parking permit the ordinance guaranteed her.

Bureaucratic inconveniences and rude treatment by public officials are unfortunate. But they do not rise to the level of constitutional violations.

Count Twelve, insofar as it alleges an equal protection violation due to the bureaucratic obstacles Plaintiff faced, is dismissed.

### D. Claims Relating to the Village FOIL Policy

Plaintiffs also claim, in Count Fifteen, that the Village's failure to fulfill all of Plaintiff O'Bradovich's FOIL requests, and its new policy requiring that FOIL requests be made by mail, are unconstitutional since they violate Plaintiffs' Fourteenth Amendment right to due process.

Plaintiff also contends that the Village has unconstitutionally denied her access to all the documents she should have received in response to her FOIL requests. Neither claim has merit.

*(1) Plaintiff O'Bradovich Has No Constitutionally–Protected Property Interest in Obtaining Any Response to FOIL Requests.*

For a due process claim to succeed, the court must first be satisfied that the plaintiff possessed a property interest that was subsequently denied by the defendant's challenged actions. If such an interest is found to exist, the court then determines whether sufficient due process was provided. *See Mathews v. Eldridge,* 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Narumanchi v. Bd. of Tr. of Conn. State Univ.,* 850 F.2d 70, 71 (2d Cir.1988).

The issue of whether or not a municipality's failure to respond to a FOIL request amounts to a deprivation of due process has already been decided by this court. In both *Webb v. Ashburn,* No. 96 Civ. 0325(SAS), 1997 WL 118355 (S.D.N.Y. Mar.17, 1997) and *Billups v. Millet,* No. 91 Civ. 6326, 1996 WL 99399 (S.D.N.Y. Mar.6, 1996), the court held that a plaintiff has no property interest in obtaining FOIL documents. *Webb* at *5–6 (dismissing a complaint after finding that "Plaintiff has not established a property interest in the requested FOIL documents"); *Billups* at *4 ("a property interest must be more than an expectation, a person must have more interest than an abstract need or desire for the benefit sought .... FOIL documents are an expectation, even if awarded pursuant to court order.").

Since due process claims require the establishment of a property interest, and because Plaintiffs could not, as a matter of law, have a property interest in the

mere expectation of receiving FOIL documents, the Village's failure to provide Plaintiffs with all of the documents they requested does not amount to a constitutional violation.

(2) *The Village's Policy of Not Responding to FOIL Requests Made by Email or Fax Does Not Violate Due Process.*

 Plaintiffs' challenge to the constitutionality of the Village's FOIL policy, which allegedly inhibited Plaintiffs' ability to retrieve public documents by requiring that FOIL requests not be made by fax or email, must be dismissed as well.

First, Plaintiffs cannot claim that the Village FOIL policy violates procedural due process. As noted above in Part B, procedural due process claims must be dismissed when they challenge only legislative action. *Interport Pilots Agency, Inc. v. Sammis,* 14 F.3d 133, 142 (2d Cir. 1994). The Village's policy is clearly a legislative act, and so is not subject to procedural due process review.

 Second, Plaintiffs cannot assert a claim against the FOIL policy under the substantive prong of the Due Process Clause either. "Substantive due process is an outer limit on the legitimacy of governmental action .... Substantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority." *Natale v. Town of Ridgefield,* 170 F.3d 258, 263 (2d Cir.1999). "When passing upon substantive due process claims" that challenge the constitutionality of legislation, "the judiciary must not substitute its judgment for that of the legislature ...." *Franza v. Carey,* 518 F.Supp. 324, 331 (S.D.N.Y.1981) (citing *Mid–Atlantic Accessories Trade Ass'n v. Maryland,* 500 F.Supp. 834 (D.Md.1980)). "All that due process requires is that the legislation bear a rational relationship to a legitimate

governmental purpose." *Id.* (citing *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 124–25, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978)).

The Village's FOIL policy easily passes the rational relationship test. The policy was a response to the increased volume of FOIL requests the Village was receiving. The Village was inundated with FOIL requests (in part due to Plaintiffs' own frequent filing of requests), and found that "the use of facsimile machines and computers to receive and process FOIL requests made by facsimile and e-mail adversely impacts on the capacity of Village staff to carry out their duties." (Defendants' Notice of Motion Ex. B.) The policy can rightly be said to bear a rational relationship to the legitimate government interest of improving the Village's ability to "track, coordinate and respond" to FOIL requests "in a timely manner," as the Village stipulated in the policy's preamble. (*Id.*)

Since the Village's new FOIL policy was not a gross abuse of governmental authority, and was rationally related to a legitimate government interest, it does not violate the Due Process clause.

The new FOIL policy does not prevent Plaintiffs from filing as many FOIL requests as they wish. They are free to file a dozen a day—but they must type them out and put them in an envelope.

Count Fifteen of the complaint is therefore dismissed.

### E. Claims of Abuse of Process and Intentional Infliction of Emotional Distress

Finally, grasping at straws, Plaintiffs assert state law claims of Abuse of Process (Count Four) and Intentional Infliction of emotional Distress (Count Ten) against Defendants Maron, Farber, and the Far-

ber Law Firm for initiating the Maron lawsuit. Both claims are dismissed.

### (1) Initiation of a Civil Lawsuit Cannot Amount to Abuse of Process.

■ An abuse of process claim has three essential elements: (1) regularly issued process, either civil or criminal, (2) an intent to do harm without excuse or justification, and (3) use of the process in a perverted manner to obtain a collateral objective. *E.g., Klass v. Frazer,* 290 F.Supp.2d 425 (S.D.N.Y.2003); *Curiano v. Suozzi,* 63 N.Y.2d 113, 480 N.Y.S.2d 466, 469 N.E.2d 1324 (1984).

As this court recognized in *Colina v. One East River Place Realty Co.,* 2000 WL 1171126 (S.D.N.Y. August 17, 2000), "The institution of a civil action by summons and complaint, a process necessary to obtain jurisdiction and begin a lawsuit, is not a sufficient basis for meeting the first element." *Id.* at *4; *see also Walentas v. Johnes,* 257 A.D.2d 352, 683 N.Y.S.2d 56, 58 (1st Dep't 1999) ("Commencement of an action, even with malicious intent, is insufficient."), *Sokol v. Sofokles,* 136 A.D.2d 535, 523 N.Y.S.2d 155, 157 (2d Dep't 1988) (finding the institution of a medical malpractice claim did not unlawfully interfere with plaintiff's person or property).

■ Numerous other courts have also held that the mere issuing of process cannot give rise to an abuse of process claim, since the unlawful pursuit of a collateral objective must occur *after* the process is issued. *PSI Metals v. Firemen's Insurance Co. of Newark, N.J.,* 839 F.2d 42 (2d Cir.1988) (finding no abuse of process where the defendant merely filed a counterclaim with the intent that the plaintiff expend money in defending the claim); *Perry v. Manocherian,* 675 F.Supp. 1417, 1429 (S.D.N.Y.1987) (holding that issuance of a summons and complaint, even if made with the intent to coerce settlement and create bad publicity for the defendant,

does not constitute abuse of process); *Curiano v. Suozzi,* 63 N.Y.2d 113, 117, 480 N.Y.S.2d 466, 469 N.E.2d 1324 (N.Y.1984) (holding that malicious motive in issuing a summons does not establish abuse of process); *Williams v. Williams,* 23 N.Y.2d 592, 596, 298 N.Y.S.2d 473, 246 N.E.2d 333 (N.Y.1969) (holding that plaintiff's claim that an action was brought against him solely for the purpose of ruining his business reputation was insufficient to establish abuse of process). In other words, a malicious motive alone does not give rise to a cause of action for abuse of process under New York law; rather, plaintiff must allege misuse of process after it was issued, or that the defendant acted to deprive the plaintiff of property "under color of process." *Williams,* 23 N.Y.2d at 595, 298 N.Y.S.2d 473, 246 N.E.2d 333; *see also, e.g., O'Brien v. Alexander,* 898 F.Supp. 162 (S.D.N.Y.1995).

■ Plaintiffs do not allege that Defendants interfered with their property or liberty interests under color of process. They only allege that the *filing* of the Maron lawsuit was an abuse of process, which, as a matter of law, it cannot be. Accordingly, Plaintiffs fail to meet the requirements of an abuse of process claim, and Count Four is dismissed.

### (2) Plaintiff's Allegations Are Insufficient to State a Claim for Intentional Infliction of Emotional Distress.

■ Plaintiffs' claim of intentional infliction of emotional distress (Count Ten) also must be dismissed. The standard for successfully pleading an IIED claim under New York law is notoriously difficult to meet: a plaintiff must allege (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard for a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4)

severe emotional distress. *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir.1999) (citing *Howell v. New York Post Co.*, 81 N.Y.2d 115, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993)). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Id.* (citations and quotations omitted).

The complaint does not and cannot allege that Defendants' participation in the Maron lawsuit was so outrageous as to be utterly intolerable in a civilized society. Indeed, as this court has held before, "the mere commencement of a civil action, even if alleged to be for the purposes of harassment or intimidation, is insufficient to support a claim of IIED." *Colina v. One East River Place Realty Co.*, 2000 WL 1171126 (S.D.N.Y. August 17, 2000). The New York Court of Appeals similarly held in *Fischer v. Maloney*, 43 N.Y.2d 553, 402 N.Y.S.2d 991, 373 N.E.2d 1215 (1978), that the deliberate commencement of a civil action for defamation to malign, harass, intimidate and inflict mental and emotional distress does not give rise to an IIED claim.

Plaintiffs' allegations of IIED are insufficient as a matter of law. Count Ten of the complaint is therefore dismissed.

The clerk of the court is directed to close the file.

This constitutes the decision and order of the Court.